UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| § | |
| LABORERS PENSION TRUST FUND – | § Civil Action No. |
| DETROIT AND VICINITY, | § |
| CONNECTICUT CARPENTERS BENEFIT | § CLASS ACTION |
| FUNDS, and ST. PAUL TEACHERS' | § |
| RETIREMENT FUND ASSOCIATION, | § |
| Individually and on Behalf of All Others | § |
| Similarly Situated, | § |
| | § |
| Plaintiffs, | § |
| | § |
| vs. | § |
| | § DEMAND FOR JURY TRIAL |
| CONN'S, INC., THEODORE M. WRIGHT, | § |
| BRIAN E. TAYLOR, and MICHAEL J. | § |
| POPPE, | § |
| | § |
| Defendants. | § |
| | § |

**COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

Plaintiffs, the Laborers Pension Trust Fund – Detroit and Vicinity ("Detroit Laborers"),

the Connecticut Carpenters Benefit Funds ("Connecticut Carpenters"), and St. Paul Teachers'

Retirement Fund Association ("St. Paul Teachers," and, together with Detroit Laborers and

Connecticut Carpenters, "Plaintiffs"), allege the following individually and on behalf of a class

of all persons and entities similarly situated, upon information and belief, except as to those

allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs'

allegations are based upon the investigation of their counsel, which included a review of: U.S.

Securities and Exchange Commission ("SEC") filings by Conn's, Inc. ("Conn's" or the

"Company"); securities analysts' reports and advisories about the Company; press releases and

other public statements issued by the Company; media reports about the Company; and

interviews of former employees of Conn's and other persons with knowledge of the matters

alleged herein, some of whom have provided information in confidence. Such confidential witnesses (each referred to as a "CW") will be identified herein by number (*e.g.*, CW-1, CW-2, *etc.*). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a federal securities class action on behalf of all persons who purchased or otherwise acquired Conn's common stock and/or call options, or sold/wrote Conn's put options between April 3, 2013 and February 19, 2014, inclusive (the "Class Period"). Plaintiffs seek to pursue remedies against Conn's and certain of its most senior executives for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Conn's is a specialty retailer of home appliances, furniture and mattresses, consumer electronics, and home office equipment that markets its wares by offering flexible financing for its products. The Company provides in-house credit options for its customers in addition to third-party financing programs and third-party rent-to-own payment plans.

3.     During its 2014 fiscal year (which spanned February 1, 2013 through January 31, 2014), Conn's financed more than 75 percent of its retail sales through its in-house financing plan. These sales generated two sources of revenue for the Company: (1) merchandise sales revenues; and (2) financing fee revenues.

4.     In order to increase sales, in the months leading up to the start of the Class Period Conn's loosened its lending policies, which, unbeknownst to investors during the Class Period, exposed the Company to high amounts of bad debt and increased collections risks.

5.     The truth about the manner in which Conn's was growing its business and the threats to its financial prospects posed by its lending practice began to come to light on

September 5, 2013.  Prior to the markets' open that day, Conn's reported lower-than-expected quarterly earnings for its 2014 fiscal second quarter, ended July 31, 2013, due to disappointing performance by its credit segment.  The Company blamed "short-term execution issues in [its] collection operations" for the miss, a portion of which it claimed to have been caused by implementation issues with a software upgrade.   However, Conn's proclaimed to investors that it had implemented corrective actions and that "negative delinquency trends rapidly reversed."  The Company also reaffirmed earnings guidance for fiscal year 2014 in the range of $2.50 to $2.65 per diluted share.

6.      Despite these assurances, Conn's stock price dropped $7.95 per share, or 11.64 percent, to close at $60.36 per share on September 5, 2013, on high trading volume.  Nevertheless, the price of Conn's stock remained artificially inflated as analysts emphasized that they considered the credit segment problems to be "one-time in nature,"[1] and that "[e]arly stage delinquencies declined in August [once the software] issue was resolved."[2]

7.      The truth about Conn's exposure to bad debt was more fully revealed five months later, on the morning of February 20, 2014, when the Company announced disappointing preliminary results for its fiscal 2014 fourth quarter ended January 31 2014, as well as a downwardly revised outlook for fiscal year 2015.  Conn's attributed its poor performance to several factors, including the effect of an increased provision for bad debt that was expected to exceed previously issued fiscal year 2014 guidance.  The Company explained that the provision was made necessary by higher-than-expected accounts receivable charge-offs and delinquency rates in December 2013 and January 2014.  The Company also blamed cold weather and high

---

[1]  Rick Nelson & Joe Edelstein, *Conn's, Inc., 2Q Hit by Credit Provision; Retail Posted Strong Results; Remain OW with $67 PT*, Stephens, Sept. 6, 2013.

[2]  Peter J. Keith, *Conn's, Inc.: Short-Term Credit Execution Issue Sinks Q2; Recommend Buying on Weakness*, Piper Jaffray, Sept. 5, 2013.

energy costs for decreasing its customers' available income for loan payments, and pressure imposed by Conn's growing retail business on its collections business, which caused execution in the segment to deteriorate.

8.      In reaction to these revelations, Conn's stock price fell $23.91 per share, or 42.85 percent, to close at $31.89 per share on February 20, 2014, on extraordinary trading volume.

9.      The statements of former employees of Conn's indicate that the Company and its executive management were well aware of the risks that Conn's excessively lenient lending practices posed to its outlook throughout the Class Period.  Indeed, according to CW-1, a former Conn's employee with personal knowledge of the Company's practices, Conn's lowered credit score requirements for borrowers in late 2012 and early 2013 and began observing a rise in delinquencies in short order—by March 2013.  CW-1 advised that Conn's Chief Executive Officer ("CEO") and Chief Operating Officer ("COO") were kept closely informed of developments regarding the Company's credit portfolio through daily trend reports delivered to them.  CW-1 also recounted that, after observing mounting collections issues, Conn's began hiring additional staff for its collections department in March 2013 and engaged a third-party firm to assist with this process as well.

10.     The account of another confidential witness makes clear that Conn's management closely monitored and participated in developments in its credit department.  According to CW-2, another Conn's employee with personal knowledge of the Company's practices, Conn's COO Michael J. Poppe spent a few days a week with the Company's credit department, held in-person meetings with credit department managers, and was involved in the department's policies and procedures.

11.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose the true facts that:

(a)    Conn's was increasing its business and improving its financial results by using underwriting and collections practices that, despite Defendants' statements to the contrary, weakened the Company's portfolio quality and left it vulnerable to substantial increases in bad debt;

(b)    Conn's was experiencing rising delinquencies at a substantially different rate than it was representing;

(c)    Conn's credit segment practices substantially threatened the Company's financial performance; and

(d)    as a result of the above, the Company's statements were materially false and misleading at all relevant times and/or lacked a reasonable basis.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, which fell more than 59.76 percent from its Class-Period high closing price of $79.24 on December 26, 2013, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

14.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1331 (15 U.S.C. § 78a(a)).

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Conn's is headquartered in this District and many of the acts that constitute the violations of law complained of herein, including dissemination of materially false and misleading information to the investing public, occurred in and/or were issued from this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiff Detroit Laborers is a defined benefit pension plan headquartered in Troy, Michigan.  As set forth in the attached certification, Detroit Laborers purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

18.     Plaintiff Connecticut Carpenters consists of a defined benefit pension plan (the "Connecticut Carpenters Pension Fund") and a defined contribution pension plan (the "Connecticut Carpenters Annuity Fund"), both of which are headquartered in Hamden, Connecticut.  As set forth in the attached certification, Connecticut Carpenters purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

19.     Plaintiff St. Paul Teachers is a defined benefit pension plan based in St. Paul, Minnesota.  As set forth in the attached certification, St. Paul Teachers purchased Conn's common stock at artificially inflated prices during the Class Period and has been damaged thereby.

20.     Conn's has its principal executive offices at 4055 Technology Forest Boulevard, Suite 210, The Woodlands, Texas 77381.  The Company is a specialty retailer that offers

consumer goods and related services, in addition to proprietary credit and financing services to its customers.  The Company has approximately 80 stores in several states and conducts its business online as well.

21.     Defendant Theodore M. Wright ("Wright") has been Conn's CEO and President since December 5, 2011.  Wright was elected Chairman of the Company's Board of Directors effective December 7, 2010, and has served as a director since 2003, when the Company went public.

22.     Defendant Brian E. Taylor ("Taylor") became the Company's Vice President and Chief Financial Officer ("CFO") on April 23, 2012.

23.     Defendant Michael J. Poppe ("Poppe") became the Company's Executive Vice President on June 1, 2010 and has been its COO since April 23, 2012.  Poppe was the Company's CFO from February 1, 2008 through April 23, 2012.

24.     Defendants Wright, Taylor, and Poppe are collectively referred to as the "Individual Defendants."  Conn's and the Individual Defendants are referred to, collectively, as "Defendants."

**FRAUDULENT SCHEME AND COURSE OF BUSINESS**

25.     Defendants are liable for: (1) making false statements; and/or (2) failing to disclose adverse facts known to them about Conn's.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers and acquirers of Conn's common stock and/or call options and sellers or writers of put options was a success, as it: (1) deceived the investing public regarding Conn's prospects and business; (2) artificially inflated the price of Conn's common stock; and (3) caused Plaintiffs and other members of the Class, as defined below, to purchase or otherwise acquire Conn's common stock and/or call options, or sell or

write Conn's put options at artificially inflated/deflated prices and suffer economic loss when the revelations set forth herein reached the market.

## BACKGROUND

26.    Conn's began as a small plumbing and heating business in 1890 and started selling home appliances to the retail market in 1937.  The Company currently sells products, including appliances, electronics, furniture, and mattresses, as well as services, such as product repair, distribution, financing, and insurance.  As of January 31, 2014, the Company operated 79 retail stores located in five states: Texas (58 stores); Arizona (8 stores); Louisiana (7 stores); New Mexico (3 stores); and Oklahoma (3 stores).

27.    A key source of revenue for Conn's is its consumer credit business.  According to the Company, it "provide[s] access to multiple financing options to address various customer needs including a proprietary in-house credit program, a third-party financing program and a third-party rent-to-own payment program."  For the twelve months ended January 31, 2014, the Company financed approximately 77.3% of its retail sales, including down payments, under Conn's in-house financing plan.

28.    The Company has described its credit process as follows:

> Our decisions to extend credit to our retail customers are made by our internal credit underwriting department - separate and distinct from our stores and retail sales department.  In addition to an auto approval algorithm, we employ a team of credit underwriting personnel to make credit granting decisions using our proprietary underwriting process and oversee our credit underwriting process. Our underwriting process considers one or more of the following elements: credit bureau reporting; income and address verification; current income and debt levels; a review of the customer's previous credit history with us; the credit risk of the particular products being purchased and the level of the down payment made at the time of purchase.  We have developed a proprietary standardized underwriting model that provides credit decisions, including down payment amounts and credit terms, based on customer risk, income level and product risk.  We automatically

approved approximately 65.2% of all credit applications that were used in purchases of products from us during fiscal 2013, and the remaining credit decisions are based on evaluation of the customer's creditworthiness by a qualified in-house credit underwriter. In order to improve the speed and consistency of underwriting decisions, we continually review our auto approval algorithm. For certain credit applicants that may have past credit problems or lack . . . credit history, we use . . . stricter underwriting criteria. The additional requirements include verification of employment and recent work history, reference checks and minimum down payment levels.

\*        \*        \*

We currently extend credit to our customers under our in-house credit program through the use of installment accounts, which are paid over a specified period of time with set monthly payments. We are no longer providing revolving charge accounts under our in-house credit program because we believe that the structure of installment credit accounts results in better credit performance with our core customer. Additionally, we offer a Conn's-branded revolving charge program through a third-party consumer lender. Most of our installment accounts provide for payment over 12 to 32 months, with the average account remaining outstanding for approximately 15-16 months.

29.    Conn's has claimed that its flexible financing programs distinguish it from its competitors. For example, in its Current Report on Form 8-K, filed on December 5, 2013, Conn's claimed: "Unlike many of its competitors, the Company provides flexible in-house credit options for its customers, in addition to third-party financing programs and third-party rent-to-own payment plans."

30.    According to CW-1, prior to the start of the Class Period, Conn's lowered its lending standards for borrowers and, on the heels of this change, began experiencing increased delinquencies. CW-1 also recounted that, by the start of the Class Period, Conn's had already begun expanding its collections department workforce and had engaged a third-party agency to assist with collections.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS OF MATERIAL FACT DURING THE CLASS PERIOD**

31.     The Class Period begins on April 3, 2013.  On that date, Conn's issued a press release announcing record fourth quarter fiscal 2013 earnings for the quarter ended January 31, 2013.  The press release stated, in part:[3]

> Retail Segment Results
>
> Revenues were $208.7 million for the three-month period ended January 31, 2013, an increase of $18.4 million, or 9.7%, over the prior-year period.
>
> \*        \*        \*
>
> Credit Segment Results
>
> Revenues were $41.6 million for the current quarter, up 14.5% from the prior-year period.  The revenue increase was attributable primarily to a comparable year-over-year increase in the average receivable portfolio balance outstanding.  The portfolio balance rose to $741.5 million at year-end, from $643.3 million as of January 31, 2012, due to higher retail sales volumes and credit penetration over the past year.  The portfolio interest and fee income yield was 18.7% for the three months ended January 31, 2013, relatively consistent with the prior-year period but down 60 basis points sequentially as a result of increased short-term, no-interest financing.
>
> Provision for bad debts rose $2.4 million over last year to $12.7 million for the quarter ended January 31, 2013.  This additional provision was driven by the $57.8 million increase in the receivable portfolio during the current quarter – 53.5% above the growth experienced in the fourth quarter of fiscal 2012.
>
> \*        \*        \*
>
> Outlook and Guidance
>
> The Company increased earnings guidance for the fiscal year ending January 31, 2014, to ***diluted earnings per share of $2.40 to $2.50 on an adjusted basis***.  The following expectations were considered in developing the guidance for the full year:

---

[3]  All emphases are added.

- Same stores sales up 3% to 8%;
- New store openings of between 10 and 12;
- Retail gross margin between 35.5% and 36.5%;
- An increase in the credit portfolio balance;
- Provision for bad debts of between 6.0% and 6.5% of the average portfolio balance outstanding;
- Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and
- Diluted shares outstanding of approximately 36.5 million.

32.     Also on April 3, 2013, the Company hosted a conference call to discuss its fourth quarter fiscal 2013 financial performance.  During the call, and as laid out in the Company's presentation accompanying the call, Defendants noted that the percent of Conn's sales generated by the Company's in-house credit offerings had grown from 66.5% in the fourth quarter of fiscal 2012 to 74.6% in the fourth quarter of fiscal 2013.  During the April 3, 2013 conference call, CEO Wright stated, among other things:

> Higher advertising spend in the holiday period didn't create the traffic we anticipated, and sales in the fourth quarter didn't meet our internal expectations.  Because of this disappointment, we reevaluated our advertising spend in the first quarter.  ***We concentrated even more of our spending on credit-based messages to consumers***.  The result has been a slightly lower spending rate, more traffic and higher quality traffic.

> Preliminary February-March same-store sales were up approximately 15%.  Same-store sales in all major categories except television were up by double digits.  Furniture and mattresses increased about 50%.  Appliance same-store sales were up about 10%.  Electronics were down low-single digits and home office was up strongly.  Higher traffic in February and March is the main reason for our increased guidance for same-store sales in fiscal 2014.

33.     Discussing the Company's credit segment, Poppe stated, in part:

> Operating profits increased on portfolio growth and stabilizing performance.  We expect to see continued growth in the first quarter driven primarily by portfolio growth on strong sales performance.  The changes in our portfolio management over the past couple of years are delivering the improved results we

expected, but drove significant volatility in our performance during that timeframe.

We now believe the effects of the policy changes made during the last half of fiscal 2012 are largely behind us. And since our portfolio management practices have been more consistent in recent quarters, *we believe we are on track to deliver stable and predictable profitability from the credit operation*.

\*       \*       \*

The 60-plus day delinquency rate declined to 6.5% at March 31, down 60 basis points from year end and 100 basis points from the same time last year. This is our lowest 60-day delinquency rate in the last 20 months.

\*       \*       \*

The *improved portfolio performance* is reflected in the weighted average credit score of the portfolio and the weighted average credit score of originations shown on Slide 11. Both of these measures have been relatively consistent over the past 2 years. This has resulted in the weighted average credit score for the portfolio of 600 at January 31, up from 585 4 years ago despite a significant reduction in the proportion of balances with a credit score of over 650, which are now financed largely through our program with GE Capital.

Between fiscal 2010 and 2012, we arbitrarily raised the minimum credit score we would underwrite to quickly control underwriting risks and reduce credit sales volumes, but the standard credit score's not a reliable predictor of credit performance at lower scores given our installment lending structure for purchase home necessities. In February, we made refinements to our decision process that resulted in declining higher risk accounts with credit scores above 525, and began underwriting applications with credit scores between 500 and 525. Looking at our February, March results, the impact of these changes was to increase the percent of applications approved by approximately 3% to 4%.

We expect the weighted average origination score to approximate 605 going forward, down slightly from 611 during the fourth quarter. *Even though the average score underwritten is declining slightly, based on analysis of our portfolio performance, we do not expect these changes to increase the credit risk in the portfolio.* Continued portfolio performance improvement and proof of our ability to maintain current retail gross margins may

give us the ability to profitably increase credit risk in the future, generating additional sales from existing store traffic.

34.    Discussing the Company's bad debt provision for the credit portfolio, Taylor stated:

> Bad debt provision rose $2.4 million over the prior year quarter driven by the substantial increase in the receivable portfolio seen in the fourth quarter of this year. As a percentage of credit portfolio, the annualized provision rate for bad debts was approximately 7%, down sequentially and year-over-year. We expect the provision rate to average between 6% and 6.5% of the average portfolio balance on a full year basis in fiscal 2014.

35.    Later in the call, in response to a question as to why the Company would lower its minimum underwritten FICO score, COO Poppe stated:

> So we would expect the FICO score to be slightly lower than we finished this past year. As we are, we took our minimum underwriting score down to 500 from 525 but our refinements to our model – we are also declining some higher-risk accounts that we had been approving this past year. ***So while we see the average underwritten score dropping slightly, we don't see the risk going up because we're also deselecting some customers that we would have approved in the past***, that will offset. And then the customers that we are writing down to 500 are being selected based on some additional criteria that we didn't use in the past. And then as far as the new stores go, we will, as we open new stores for the first 45 to 60 days, we will have a little more flexibility in underwriting there to get the grand opening message out. And then they will fall right back in line with the underwriting criteria of all the other stores in the portfolio.

36.    When asked about the average balance in the Company's credit portfolio increasing, thus implying a greater credit risk, COO Poppe responded:

> You bet. I think there's a few things driving that. One, the portfolio, ***there's a lot more recent origination, you've got more recent balances***, so you don't have a lot of older aged lower balances in the portfolio. And as we over the last couple of years have worked hard to purge out a lot of that older, higher-risk credit, it has had the impact of increasing the average balance. So we don't see that as increasing risk. In fact we think we have decreased risk there. The second thing that is going on is that we

changed our merchandising mix and we have eliminated a lot of lower price point SKUs, the average – the starting ticket size is up, and you have fewer of the small tickets, being underwritten and built into the finance portfolio.  And then, last, as the Web has been a benefit to us in driving more new customers, a new customer is helping but with the first point, just driving more new originations to new customers.  ***From a risk standpoint, we don't see the higher average balances as having any meaningful impact to increasing risk in the portfolio***.

37.    On April 5, 2013, the Company filed its annual report on Form 10-K for its fiscal year ended January 31, 2013.  The 2013 Form 10-K, which was signed by CEO Wright and CFO Taylor, and contained Sarbanes-Oxley ("SOX") certifications signed by Wright and Taylor, stated in part:

We also focused on improving the profit contribution of our credit operation by ***raising our underwriting standards and modifying our collection practices to focus on higher value accounts that we believe are most likely to be paid***.  This included, among others, changing our charge-off policy to accelerate the write-off of past due accounts and limiting the re-aging of customer accounts.

\*        \*        \*

In order to improve the profit contribution of our credit operation, ***we have raised our underwriting standards and modified our collection practices over the past two years to focus our portfolio servicing operations on the collection of higher value accounts that we believe are most likely to be paid***.  The primary changes made were to:

Change our charge-off policy such that accounts will be charged off more quickly than in the past, requiring accounts over 209 days past due at month end to be charged off;

Limit re-aging of customer accounts so that no account can be re-aged more than a total of 12 months over the life of the account, among other requirements; and

Raise the minimum credit scores and shorten contract terms for higher-risk products and smaller-balances originated to continue to increase the payment rate and improve credit quality.

The impact of these changes has allowed us to reduce collection costs and ***improve the quality of our credit portfolio***. As a result, we have increased the average credit score of our outstanding balance to 600 as of January 31, 2013 from 586 as of January 31, 2010. We believe the above changes will allow us to realize a higher and more consistent level of profitability from our credit operations.

38.    On June 6, 2013, the Company issued a press release announcing its financial results for the quarter ended April 30, 2013. The press release stated, in part:

Retail Segment Results

Revenues for the quarter ended April 30, 2013 increased $42.6 million, or 25.5%, over the prior-year period to $209.8 million. The year-over-year growth was driven by the significant expansion in same store sales and the five Conn's HomePlus$^{TM}$ stores opened in fiscal 2013. Two new stores opened on April 26, 2013. As of quarter end, 22 existing stores were updated to the Conn's HomePlus format.

* * *

Credit Segment Results

Revenues were $41.3 million for the current quarter, up 22.6% from the prior-year period. The revenue increase resulted from an increase in the average receivable portfolio balance outstanding. The portfolio balance rose to $773.4 million at April 30, 2013, from $635.2 million in the prior-year period, due to higher retail sales volumes and credit penetration over the past year. The portfolio interest and fee income yield was 18.0% for the three months ended April 30, 2013, relatively consistent with the prior-year period, but down 70 basis points sequentially as a result of increased short-term, no-interest financing.

Provision for bad debts was $13.8 million for the quarter ended April 30, 2013, an increase of $4.8 million from the prior-year period. This additional provision was driven primarily by the substantial year-over-year growth in the average receivable portfolio balance outstanding, which includes an increase of $31.9 million during the current quarter.

*        *        *

The Company increased earnings guidance for the fiscal year ending January 31, 2014, to diluted earnings per share of $2.50 to

15

$2.65 on an adjusted basis. The following expectations were considered in developing the guidance for the full year:

- Same stores sales up 8% to 13%;

- New store openings of between 10 and 12;

- Retail gross margin between 37.5% and 38.5%;

- An increase in the credit portfolio balance;

- Credit portfolio interest and fee yield of between 18.0% and 18.3%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

- Provision for bad debts of between 6.5% and 7.0% of the average portfolio balance outstanding;

- Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

- Diluted shares outstanding of approximately 37.0 million.

39.     On June 6, 2013, the Company hosted a conference call to discuss its first quarter fiscal 2014 results. During the call, CEO Wright stated, in part:

As discussed on our prior conference call, sales in the fourth quarter didn't meet our internal expectations. Higher advertising spend in the holiday period didn't create the traffic we anticipated. Because of this disappointment, we reevaluated our advertising. We concentrated more of our spending on credit-based messages to consumers. We continued this approach into May and June and has seen consistently improving traffic over the prior year. Specifically, we've allocated more of our spending to TV, direct mail and digital. We've increased TV exposure in our average markets roughly 50%. We reduced radio and print spending, with radio now an infrequent component of our overall plan. And we've included more and stronger messages to apply online in all media. Some results of our advertising changes are total applications for credit increased 18% in April and May, reflecting increased customer traffic overall. Online applications increased 44% in April and May.

***The percentage of applications resulting in a completed sale increased 2.3% in April and May, indicating the quality of traffic and our ability to convert improved as well***.

40.    Discussing the Company's credit business, Poppe stated, in part:

As shown on Slide 8, roughly 90% of our sales in the first quarter were paid for using one of the three monthly payment options we offer.  The increase in the percent of sales under our finance program was driven largely by the change in merchandise mix as ASPs increased and the volume of cash tickets declined significantly.  The *improved performance in delinquency* and percent of the portfolio re-aged, as well as charge-off trends are shown on Slides 9 and 10.  60-plus day delinquency declined to 6.7% at April 30, down 40 basis points from year end and 60 basis points from the same time last year.  This is our lowest quarter in 60-day delinquency rate since July 2011.

\*        \*        \*

As discussed in the prior call, we implemented changes in our underwriting process during the quarter.  These changes were based on analysis performed over the past year through identified credit attributes that would allow us to enhance our decision model to better identify quality credit customers.  *It is important to note that standard credit scores are not reliable predictors of customer performance at lower scores*.  We continue to test and enhance the internal custom grading process we've developed over our 45 plus years of offering credit to sub-prime borrowers.  The analysis was based on our historical portfolio of performance data and supported approving certain and lower score customers we had been declining while declining certain higher score customers we had been approving.  As a result, the approval rate increased about 400 basis points compared to the prior year quarter.  Additionally, the analysis indicates that the changes should have little effect on the credit risk and the receivables underwritten despite the fact that the average score underwritten dropped from 611 in the fourth quarter to 602 in the first quarter.  *Early results indicate that this is in fact the case as first payment delinquency rate for the February and March originations trended lower compared to prior year performance*.

Our approval rate and decline decisions – sorry our approval and decline decisions are based on expected transaction profitability.  Our ability to incrementally approve customers being declined today and still deliver our targeted 20% return on equity increases as the interest yield and retail gross margin increase.  The additional expected credit losses would be more than paid for by the increased gross profit.

Our ability to improve credit profitability over time will be driven by improving portfolio performance, portfolio growth driven by same-store sales growth and new store openings, portfolio yield expansion from the ability to charge higher interest rates as we enter new markets such as New Mexico and Arizona, where we're earning 26% on interest-bearing accounts, increased operating leverage as a result of portfolio growth and the ability to [fund] much of the portfolio growth from company earnings.  As such, we expect continued improvement in the profit contribution of the credit operation over the coming year.

41.    As the conference call continued, Taylor stated, in part:

Credit segment revenues increased $8 million over the first quarter of last year due to a 19% increase in the average portfolio balance. SG&A expense rose 16% from the prior quarter due to portfolio growth, which drove increased staffing levels.

Servicing costs were 38% of revenues this quarter, 230 basis points below last year.  Bad debt provision rose $5 million over the prior year quarter, driven primarily by the $118 million increase in the average receivable portfolio.    The increase also reflects a $32 million increase in the portfolio within the current quarter, compared to a decline of $8 million during the prior year period. As a percentage of the average credit portfolio balance, the annualized provision rate was approximately 7%, relatively consistent with the fourth quarter of fiscal 2013.  Based on current trends, we expect the second quarter charge-off rate to increase slightly from the first quarter level and the full year charge-off rate to finish between 5% and 6% for fiscal 2014.  *We expect the bad debt provision rate to range between 6.5% and 7% of the average portfolio balance on a full year basis in fiscal 2014.  The increase in our guidance for bad debt provision is driven by higher-than-previously anticipated sales growth and the related acceleration in projected portfolio growth*.

42.    During the question and answer portion of the call, COO Poppe responded to a

question regarding the Company's increasing bad debt provision, stating:

It is driven largely just by – as we accelerate growth and you continue to see more receivables roll into the portfolio and move into – in season in the portfolio, it is driving this acceleration in the provision rate.  And as performance continues to improve, that should moderate over time.  And we would expect the guidance implies that the provision rate should improve over the remainder of the year.

43.     When asked later in the call why the Company's provision for bad debt was increasing, and whether the increase was tied to credit metrics, COO Poppe responded negatively, stating that "***It's . . . the speed of growth in the portfolio***."

44.     Also on June 6, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended April 30, 2013, which confirmed the financial results in the June 6, 2013 press release, was signed by CFO Taylor, and contained required SOX certifications signed by CEO Wright and CFO Taylor.

45.     These statements were false and misleading because the following true facts were known by Defendants but concealed from the investing public during the Class Period:

(a)     Conn's was growing its business and financial results by utilizing underwriting and collections practices that, despite Defendants' statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in bad debt;

(b)     Conn's faced increased delinquency and charge off rates in its credit segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment; and

(d)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

46.      These statements were also false when made because, according to CW-1, Conn's CEO and COO were regularly informed of the Company's collections performance through daily trend reports delivered to them by the collections department.  COO Poppe's regular visits to the credit department and involvement in its policies and procedures, as

described by CW-2, also reflect management's awareness of Conn's collection troubles even as it reassured investors as to its ability to collect and its bright prospects.

## THE TRUTH BEGINS TO EMERGE

47.    On September 5, 2013, the Company issued a press release announcing its financial results for the quarter ended July 31, 2013.  The press release stated, in part:

> Theodore M. Wright, the Company's Chairman and CEO, commented, "August net sales increased 51% over the prior-year period.  Same store sales in August rose 31%.  Phoenix market store openings have been successful with three stores now open. We plan to open four more Phoenix area locations over the next several quarters."
>
> Mr. Wright continued, "The performance of our credit segment for the second quarter was below our expectations due to short-term execution issues in our collection operations.  Corrective actions were taken and negative delinquency trends rapidly reversed. Early stage delinquency at the end of August had declined 12% from peak levels earlier in the month.  At August 31, early stage delinquency was below the levels experienced at the end of each of the past nine quarters.  We expect further improvement in overall delinquency rates over the next several months.  ***Despite the challenges in our collections operations in the second quarter, we are reaffirming our guidance for the year***."
>
> *        *        *
>
> Retail Segment Results
>
> Revenues were $224.0 million for the quarter ended July 31, 2013, an increase of $52.1 million, or 30.3%, over the prior-year quarter. Sales in all product categories increased driven by the 18.4% increase in same store sales and new store openings.  With new store openings and the remodeling of existing stores, 31 stores were operating in the Conn's HomePlus format at July 31, 2013.
>
> *        *        *
>
> Credit Segment Results
>
> Revenues totaled $46.7 million in the current period, an increase of 31.5% over the prior-year quarter.  The revenue growth was attributable to the increase in the average receivable portfolio

balance outstanding. The customer portfolio balance equaled $843.1 million at July 31, 2013, increasing $181.3 million from a year ago. The portfolio interest and fee income yield was 17.9% for the quarter ended July 31, 2013, down 50 basis points from the prior-year period as a result of increased short-term, no-interest financing.

Provision for bad debts was $21.3 million for the quarter ended July 31, 2013, rising $9.3 million from the prior-year period. *Additional provision was required for a 24.6% increase in the average receivable portfolio balance outstanding and deterioration in delinquency rates in June and July of the current year*. The percentage of the customer portfolio balance greater than 60 days delinquent was 8.2% as of July 31, 2013, which compares to 7.5% a year ago and 6.7% as of April 30, 2013. The increase in delinquency resulted in approximately $5.9 million, or 28%, of the total provision for bad debts during the three months ended July 31, 2013. Collection operations performance improved in August with the early stage, 1 to 90 day, delinquency rate declining 160 basis points. As of August 31, 2013, 90- plus day delinquency was 6.3%, up 50 basis points from quarter end.

*     *     *

Outlook and Guidance

*The Company reaffirms its earnings guidance for the fiscal year ending January 31, 2014 to diluted earnings per share of $2.50 to $2.65 on an adjusted basis*. The following expectations were considered in developing the current guidance for the full year:

- Same stores sales up 15% to 20%;

- New store openings of between 10 and 12;

- Retail gross margin between 37.5% and 38.5%;

- An increase in the credit portfolio balance;

- Credit portfolio interest and fee yield of between 17.8% and 18.1%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

- Credit segment provision for bad debts of between 8.5% and 9.0% of the average portfolio balance outstanding based on the

same store sales and new store opening expectations presented above;

- Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

- Diluted shares outstanding of approximately 37.0 million.

48.     On September 5, 2013, the Company hosted a conference call to discuss its second quarter fiscal 2014 results.  During the call, Wright stated, in part:

> Starting with the credit segment, ***our provision for bad debts for the second quarter was higher than forecast and delinquency unexpectedly deteriorated***.
>
> In late May, we upgraded our collections platform.  This is a software system our collections agents use when collecting delinquent balances.  The system we upgraded to is widely installed and has been in use elsewhere for years.  Our former platform was internally developed older technology and not the best long-term solution for the company.  Although software systems are never perfect and we can improve the use of the new system, the platform worked properly when placed in service.
>
> Unfortunately, there were errors in the construction of data flows from our other systems to the collections platform.  Some information wasn't transferred to the new system and wasn't available to our collections agents, some information was lost and not recovered.  User errors, typical with the new system, made matters worse.
>
> Our primary collection method is phone communication with delinquent customers.  These implementation errors reduced the phone numbers available for our collections agents to pursue collections.  Because the reduction in phone numbers available occurred over time, the effects were not immediately apparent.
>
> By July, delinquency was increasing for reasons we couldn't understand.  ***But by mid-July, we have identified the causes.  And by early August, corrective actions were completed***.  Since that time, collections performance has improved rapidly, and Mike will provide more details on this improvement.
>
> The damage was already done.  Later-stage delinquency deteriorated and charge-offs of uncollectible accounts during June

and July were higher than expected.  Additional provision for bad debt expense of $5.9 million was required in the second quarter.

***Our failure to implement the system properly and to identify issues quickly enough was painful and expensive, but the issues were identified and were corrected***.  We don't expect any additional expense from these implementation issues in the third quarter of this year or other future periods.

***We are reaffirming the earnings guidance provided last quarter for the full year of $2.50 to $2.65 per share***.

49.    As the second quarter fiscal 2014 conference call continued, COO Poppe stated, in part:

Turning to underwriting trends for the quarter.  As shown on Slide 15, roughly 92% of our sales in the quarter were paid for using 1 of the 3 monthly payment options we offer.  The increase in the percent of sales under our finance program was driven largely by the changes in our advertising program, as well as merchandise mix changes, which drove higher ASPs and reduced the volume of cash tickets.

The approval rate under our in-house credit program increased by 2.6% over the prior-year period, and the average score underwritten during the quarter was 601 compared to 602 in the first quarter.  Results so far indicate that performance of current year originations is within expectations.

At the end of August, our delinquency issues are concentrated largely in late stage delinquencies, as previously shown on Slide 12.  The deterioration in performance occurred across all years of loans originated, and less than 10% of the late stage delinquency at the end of August of this year and last year was from accounts originated in each respective fiscal year.

***We expect to see improvement in the profit contribution in the credit segment over the coming quarters***.

50.    Discussing the financial performance of the Company's credit segment, CFO Taylor stated, in part:

Credit segment revenues were $47 million this quarter, up 31% from the prior-year period.  A 25% increase in the average portfolio balance was the primary driver of the reported growth.

Annualized interest and fee yield was 18% this quarter, down 50 basis points from a year ago. Short-term, no-interest receivables represented slightly over 30% of the portfolio balance at July 31, 2013.

General and administrative expenses for the segment rose 39% over the prior-year period due to higher originations and portfolio growth, which drove an increase in staffing levels. Servicing costs were 38% of revenue this period, comparable with the fiscal 2014 first quarter level.

Provision for bad debt equaled $21 million this quarter, reflecting portfolio growth and an increase in the delinquency rates. Excluding the impact of the second quarter collection issues previously discussed, bad debt provision rose $3.4 million or 28% over the prior-year quarter, driven by growth in the outstanding receivable portfolio. The annualized provision rate was 7.3% on a normalized basis, consistent with the levels reported in the prior 2 quarters.

Based on current trends, we expect the bad debt provision rate to range between 8.5% and 9% of the average portfolio balance for fiscal 2014. This provision for bad debt rate guidance for the year is higher than provided last quarter. Part of the increase in guidance is due to the $5.9 million in additional provision recorded in the second quarter. The guidance for provision rate also increased because of the faster rate of sales growth and related portfolio growth.

Portfolio growth causes a higher provision rate because the provision for new loan originations is front-end loaded. We provide a full year's amount of expected credit losses in the month of origination.

51.    During the question and answer portion of the call, the Individual Defendants were asked whether they were "100% certain" that the credit segment results were negatively impacted by only a systems issue or whether, in actuality, there was "some underlying deterioration within the portfolio." CEO Wright responded:

I think the one caution is, with a credit portfolio, saying something with a 100% certainty is always a dangerous thing. But I would say, *we are certain that the impact in the current quarter was related to the systems issue*. To the extent that we've had other issues where credit portfolio performance wasn't as good as we

24

would like, or there were other influences, those were already in place the quarter before and reflected in our provision at time and our provision forecast going forward. So, 100% certainty, I'm a little cautious saying that. But ***it's clear that, other than the systems-related issue, there was no change in performance – meaningful change in performance or trend compared to the prior quarter***.

52.    When questioned during the call on whether increased in-house financing of sales created increased problems for the Company's credit portfolio performance, CEO Wright answered:

> The short answer is no. We don't believe that, that increase in the percentage of sales that we're financing had anything to do with the issues that we faced in collections. The increase in the percentage of our sales that we financed is due in part to the higher average selling prices. That's a trend that's been going on now for several years. . . . So that wouldn't really be something that would affect the current period. And then the other factor which does come into play in the recent past is increasing our advertising of our credit offering. So we're attracting more customers who have an interest in our credit offering and may want to use that. But that doesn't – ***they're still the same type of customers we've always gotten. We're still using the same underwriting tools and practices that we used before***. And so we expect we'll get a similar result. So no, we don't believe that, that's a factor.

53.    Also on September 5, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended July 31, 2013, which confirmed the financial results in the September 5, 2013 press release, was signed by Taylor, and contained required SOX certifications signed by Wright and Taylor.

54.    In reaction to these disclosures, Conn's stock price dropped $7.95 per share, or 11.64 percent, to close at $60.36 per share on September 5, 2013, on high trading volume. However, the Company's stock price remained artificially inflated after this partial disclosure of fraud as even analysts believed the increased loan loss provision reflected a temporary setback. As Stephens analysts stated in a report: "Conn's disappointed investors with a 2Q miss driven

by a significant increase in the provision for loan loss related to the poor implementation of a new collections system platform.  Importantly, we view the systems issue as ***one-time in nature***."[4]  Oppenheimer Equity Research analysts echoed that sentiment:  "Our bottom-line message: The CONN retail business is tracking very strongly, and the credit issues that impacted Q2 results are ***one-time and already fixed***."[5]

55.     On December 5, 2013, the Company issued a press release announcing its financial results for the quarter ended October 31, 2013.  The press release stated, in part:

> "We achieved the highest quarterly revenue and net income in Conn's history," stated Theodore M. Wright, the Company's Chairman and CEO.  "This sales trend continued into November with retail sales expanding 49%.  November same store sales rose 32%."
>
> *        *        *
>
> Retail Segment Results
>
> Revenues were $257.5 million for the quarter ended October 31, 2013, an increase of $89.8 million, or 53.6%, over the prior-year period.   Significant sales growth was reported across all major product categories.
>
> *        *        *
>
> Credit Segment Results
>
> Revenues totaled $53.4 million in the current period, an increase of 37.8% over the prior-year quarter.   The revenue growth was attributable to the increase in the average receivable portfolio balance outstanding.   The customer portfolio balance equaled $944.8 million at October 31, 2013, rising $261.1 million from a year ago.  The portfolio interest and fee income yield was 17.8% for the quarter ended October 31, 2013, down 150 basis points from the prior-year period as a result of increased short-term, no-interest financing.

---

[4]  Nelson & Edelstein, *supra*.

[5]  Brian Nagel, Rupesh Parikh, & Erica Eiler, *Conn's Inc.: Pullback an Opportunity for Investors*, Oppenheimer Equity Research, Sept. 5, 2013.

Provision for bad debts was $22.5 million for the quarter ended October 31, 2013, rising $9.3 million from the prior-year period. The annualized provision rate was 10.1% for the quarter and 9.4% year-to-date. The percentage of the customer portfolio balance greater than 60 days delinquent was 8.5% as of October 31, 2013, which compares to 7.0% a year ago and 8.2% as of July 31, 2013.

*    *    *

Outlook and Guidance

***The Company raised its earnings guidance for the fiscal year ending January 31, 2014 to diluted earnings per share of $2.75 to $2.80 on an adjusted basis***. The following expectations were considered in developing the current guidance for the full year:

- Same stores sales up 22% to 25%;

- New store openings of 13;

- Retail gross margin between 39.3% and 39.8%;

- An increase in the credit portfolio balance;

- Credit portfolio interest and fee yield of between 17.8% and 18.1%, reflecting a higher proportion of the portfolio balance represented by no-interest credit programs than in fiscal 2013;

- Credit segment provision for bad debts of between 9.4% and 9.7% of the average portfolio balance outstanding based on the same store sales expectations presented above;

- Selling, general and administrative expense of between 28.5% and 29.0% of total revenues; and

- Diluted shares outstanding of approximately 37.0 million.

The Company also initiated earnings guidance of diluted earnings per share of $3.80 to $4.00 for the fiscal year ending January 31, 2015. The following expectations were considered in developing the guidance:

- Same stores sales up 7% to 12%;

- New store openings of 15 to 20;

- Retail gross margin between 39.0% and 40.0%;

- An increase in the credit portfolio balance;

- Credit portfolio interest and fee yield of approximately 18.0%;

- Credit segment provision for bad debts of between 8.0% to 9.0% of the average portfolio balance outstanding based on the same store sales and new store opening expectations presented above;

- Selling, general and administrative expense of between 28.0% and 29.0% of total revenues; and

- Diluted shares outstanding of approximately 37.1 million.

56.    On December 5, 2013, the Company hosted a conference call to discuss its third quarter fiscal 2013 financial results.  During the call, Wright stated, in part:

> *Consistent with our past practice, we are initiating guidance for fiscal 2015 at $3.80 to $4.  Guidance at the top end for fiscal 2015 is a 43% increase over the top end for fiscal 2014.*
>
> \*      \*      \*
>
> Turning to our credit segment.  *The company made good progress in addressing the issues we experienced in the second quarter with our credit collection system.  We are on track to meet our timetable of 4 to 5 months from our last conference call to fully address the effects of these issues on our portfolio.  Delinquency should improve markedly over the next quarter.*

57.    As the call continued, COO Poppe discussed details concerning the Company's credit segment, stating, in part:

> Credit segment profits increased sequentially on portfolio growth and declined year-over-year due to a higher provision for bad debts and lower interest yields, given the increased balance of interest fee receivables.
>
> \*      \*      \*
>
> Many years of experience underwriting a single type of credit for our core customer, limited variation and underwriting practices over time and experienced collecting this specific type of credit allow us to deliver consistent performance.

28

During fiscal 2012, changes were made that shortened contract terms and the time period before charge-off, including limiting re-aging. Credit accounts are now paying down more quickly and charge-offs are occurring sooner in the contract life. Since the receivables pay off quickly, only small balances remain from recent fiscal year originations. 1% of fiscal 2011, 11% of fiscal 2012 and only 35% of the balances originated last fiscal year. The more conservative re-aging and charge-off practices result in the balances remaining in the portfolio being higher quality than in the past.

We expect the final static pool loss rates for the recent fiscal years to be in line with historical experience, though there may be modest upward pressure as a result of the recent execution issues and for the current fiscal year due to the increased volume of new credit customers. However, due to the rapid pay down of the receivables we now experience, we do not expect the final static pool loss rates under reasonably foreseeable scenarios to exceed 7%.

Turning to underwriting trends for the quarter . . . roughly 93% of our sales in the quarter were paid for using one of the three monthly payment options offered. The increase in the percent of sales under our finance program was driven largely by changes in our advertising programs, as well as merchandise mix changes which drove higher ASPs and reduced the volume of cash tickets.

The approval rate under our in-house credit program decreased by 3.3% from the prior quarter levels, and the average score underwritten during the quarter was 599 compared to 601 in the second quarter. Results so far indicate that performance of current year originations is within expectations.

***We expect this quarter's improvement in the profit contribution of the credit segment to continue over the coming quarters***.

58.     Later in the call, CFO Taylor discussed the Company's credit segment and fiscal

2015 guidance, stating, in part:

Provision for bad debts equaled $22.5 million this quarter, reflecting portfolio growth and the year-over-year increase in delinquency rates.

Based on current trends, we expect bad debt provision rate to range between 9.4% and 9.7% of the average portfolio balance for fiscal 2014. The guidance for provision rate increased due to the faster

sales growth and related portfolio growth realized in the third quarter and projected for the fourth quarter.

*        *        *

We initiated earnings guidance of diluted earnings per share of $3.80 to $4 for our fiscal year ended January 31, 2015. Full year expectations considered in developing the guidance include: Same-store sales growth of between 7% and 12%; new store openings of 15 to 20; retail gross margin range of between 39% and 40%; credit portfolio and the interest free fee yield of around 18%; and a credit segment provision for bad debts of between 8% and 9%, again dependent on our same-store sales expectations and no significant changes in the number of diluted shares outstanding.

59.    When asked whether the Company was doing "anything different from a credit standpoint," CEO Wright responded:

Yes. Generally, we did not change our underwriting standards and risk modeling for the quarter. However, we did evaluate some of our processes and controls around the approval of credit and made some minor modifications to those processes and controls to eliminate some of the very highest risk – the highest risk customers. We also saw a change in the mix of applications that influenced the approval rate. So the change in approval rate is not strictly the result of alterations in our approval process. But we did make some modifications during the quarter.

60.    Also on December 5, 2013, the Company filed its quarterly report on Form 10-Q for the quarter ended October 31, 2013, which confirmed the financial results in the December 5, 2013 press release, was signed by CFO Taylor, and contained required SOX certifications signed by CEO Wright and CFO Taylor.

61.    These statements were false and misleading because they continued to suppress the following true facts that were known by Defendants but concealed from the investing public during the Class Period:

(a)     Conn's was growing its business and financial results by utilizing underwriting and collections practices that, despite Defendants' statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in bad debt;

(b)     Conn's faced increased delinquency and charge off rates in its credit segment;

(c)     At all relevant times, Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment; and

(d)     As a result of the foregoing, Defendants' statements regarding the Company's financial performance and expected earnings in 2014 and 2015 were false and misleading and lacked a reasonable basis when made.

## THE TRUTH IS REVEALED

62.     On February 20, 2014, the Company issued a press release announcing preliminary fourth quarter fiscal 2014 results and updated its fiscal 2015 earnings guidance.  The press release revealed that the Company's "[c]redit segment provision for bad debts as a percentage of the average outstanding portfolio balance is *expected to exceed previously issued full-year fiscal 2014 guidance*" and that the "percentage of the customer portfolio balance 60-plus days delinquent was 8.8% at January 31, 2014, an increase of 30 basis points from October 31, 2013."  In the press release, the Company also revealed that it was lowering its recently issued fiscal 2015 earnings guidance to $3.40 per diluted share—down from $3.70 per diluted share.  The press release also stated, in part:

> Based on preliminary results, the Company expects to generate diluted earnings per share of between $0.76 and $0.81 in the fourth quarter of fiscal 2014, which includes a net benefit of approximately $0.01 per diluted share associated with facility closures.  After excluding this benefit, adjusted diluted earnings per share for the three months ended January 31, 2014, is expected

to range between $0.75 and $0.80 – *below the level anticipated in the Company's previously issued full-year fiscal 2014 guidance. This decline reflects the impact of increased provision for bad debt due to higher-than-expected accounts receivable charge-offs and delinquency rates in December and January, and portfolio growth.*

*The Company updated its full-year fiscal 2015 earnings guidance to reflect the impact of higher-than-anticipated recent delinquency rates and lower expected sales increases, principally in the electronics category.*  For the fiscal year ending January 31, 2015, the Company currently expects to generate diluted earnings per share of $3.40 to $3.70 which compares to previous guidance of $3.80 to $4.00 per diluted share.

Theodore M. Wright, Conn's chairman and chief executive officer stated, "Our revised earnings guidance for fiscal 2014 of an adjusted $2.59 to $2.64 per diluted share is an increase of approximately 60% from the prior year.  Our retail performance was outstanding for the fourth quarter and full year.  We achieved our target of 40% retail gross margin for the quarter and realized significant operating leverage.  Newly opened stores are performing well and contributing to profitability.

"Credit segment performance did not keep pace and delinquency and charge-offs rose in December and January.  Sales driven portfolio growth combined with seasonal portfolio increases placed pressure on our collections operation and execution deteriorated.  Sustained below-normal temperatures and the related higher energy costs in some of our markets also temporarily impacted our consumer's income available for debt service.

63.    Conn's press release revealed, among other things, that the percentage of the loan portfolio delinquent 60 days or more rose 30 basis points from the end of October to 8.8% by January 31, 2014, the end of its fiscal year.  By comparison, the Federal Reserve Bank of New York reported fourth quarter 2013 credit card debt delinquent 90 days or more had increased to 9.5% from 9.4% in the third quarter.

64.    The market reacted swiftly to the February 20, 2014 press release.  On abnormally high trading volume of more than 25 million shares traded, the price of Conn's common stock fell $23.91 per share, or 42.85 percent, to close at $31.89 per share.

65.    Investor shock at Conn's results was reflected in the reports of equities analysts, who questioned the Company's blame of external factors for its credit portfolio's growth. Oppenheimer Equity Research analysts downgraded Conn's, commenting that a conversation with CFO Taylor left the research firm with the impression that, "Credit issues at CONN in Q4 (Jan. 2014) reflect *more internal and specifically collections issues than external factors*."[6]  A SunTrust Robinson Humphrey analyst also attributed the miss to Company-specific issues as opposed to cold weather issues in Texas, the state in which the majority of Conn's stores are located:  "It appears that the credit shortfall was due more to poor execution (i.e. not collecting effectively enough) vs. environmentally related.  We understand that the lower income consumer may be under more stress, but are not aware of Texas residents having similar problems."[7]

## ADDITIONAL SCIENTER ALLEGATIONS

66.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted with reckless disregard for the true information known to them at the time for the reasons discussed above.  In so doing, Defendants committed acts, and practiced and participated in a course of business that operated as a fraud or deceit on purchasers and acquirers of Conn's common stock and/or call options and sellers or writers of put options during the Class Period.

67.    Statements by confidential informants corroborate the conclusion that Conn's and its management was aware of the Company's deficient lending practices and collections issues even as they projected a rosy outlook to investors.  Not only did the Company, according to CW-1, lower its prerequisites for the extension of customer credit shortly before the Class

---

[6]  Brian Nagel, *Snap Commentaries, Update: CONN Issues More Its Own?*, Oppenheimer Equity Research, Feb. 20, 2014.

[7]  David G. Magee, *4Q Outlook Lowered Due to Higher Delinquencies in the Credit Business*, SunTrust Robinson Humphrey, Feb. 20, 2014.

Period—inviting an uptick in delinquencies—but CW-1 and CW-2's accounts show that Conn's and its executive management were deeply involved in the affairs of the collections department in the period following this loosening of standards. According to CW-1, Conn's CEO and COO were provided with daily trends reports from the credit department. In addition, according to CW-2, COO Poppe visited the credit department on at least a weekly basis and was involved in the credit department's policies and procedures.

## CLASS ACTION ALLEGATIONS

68.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Conn's common stock and/or call options, or sold/wrote Conn's put options during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

69.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Throughout the Class Period, Conn's stock actively traded on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "CONN." As of March 21, 2014, Conn's had 36,131,069 shares outstanding, owned by thousands of persons.

70.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Conn's common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

71.    Plaintiffs' claims are typical of the claims of members of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

72.    Plaintiffs will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

73.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

74.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Conn's common stock and operated as a fraud or deceit on Class Period purchasers and acquirers of Conn's common stock and/or call options and sellers or writers of Conn's put options by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior

misrepresentations, omissions, and fraudulent conduct were disclosed and became apparent to the market, the price of Conn's common stock fell precipitously as the prior artificial inflation came out.  As a result of their purchases and acquisitions of Conn's common stock and/or call options or sales or writings of Conn's put options during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws when the truth about Conn's was revealed, which removed the artificial inflation from the price of Conn's common stock.

75.     By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Conn's business and prospects.  Defendants' false and misleading statements had the intended effect and caused Conn's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $79.24 per share on December 26, 2013.

76.     As a direct result of the disclosure identified herein, the price of Conn's common stock fell precipitously.  This removed the artificial inflation from the price of Conn's common stock, causing real economic loss to investors who had purchased and acquired Conn's common stock at artificially inflated prices during the Class Period.

77.     The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in Conn's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Conn's common stock and the subsequent

significant decline in the value of Conn's common stock when Defendants' prior

misrepresentations and other fraudulent conduct were revealed.

## **PRESUMPTION OF RELIANCE**

78.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-

the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material

facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor

to misjudge the value of the Company's common stock; and

(e)     Plaintiff and other members of the Class purchased or acquired Conn's

common stock and/or call options, or sold/wrote Conn's put options between the time

Defendants misrepresented or failed to disclose material facts and the time the true facts were

disclosed, without knowledge of the misrepresented or omitted facts.

79.     At all relevant times, the market for Conn's common stock was efficient for the

following reasons, among others:

(f)     as a regulated issuer, Conn's filed periodic public reports with the SEC;

(g)     Conn's regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases

on the major news wire services and through other wide-ranging public disclosures, such as

communications with the financial press, securities analysts, and other similar reporting services;

(h)     Conn's was followed by several securities analysts employed by major

brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

        (i)     Conn's common stock was actively traded on an efficient market, the NASDAQ, where the Company's common stock trades under the ticker symbol "CONN."

        80.     As a result of the foregoing, the market for Conn's common stock promptly digested current information regarding Conn's from all publicly available sources and reflected such information in Conn's common stock.  Under these circumstances, all purchasers and acquirers of Conn's common stock and/or call options, or sellers or writers of Conn's put options during the Class Period suffered similar injury through their purchases or acquisitions of Conn's common stock and/or call options, or sales and writings of Conn's put options at artificially inflated prices and the presumption of reliance applies.

        81.     Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its operations, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972).

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

        82.     Defendants' verbal "Safe Harbor" warnings accompanying their oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

        83.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Conn's who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as

they were not stated to be such assumptions underlying or relating to any projection or statement

of future economic performance when made, nor were any of the projections or forecasts made

by Defendants expressly related to, or stated to be dependent on, those historic or present tense

statements when made.

**COUNT I**

**For Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 Against All Defendants**

84.     Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 83 by reference.

85.     During the Class Period, Defendants disseminated or approved the false

statements specified above, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make

the statements made, in light of the circumstances under which they were made, not misleading.

86.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that

they:

        (a)     Employed devices, schemes, and artifices to defraud;

        (b)     Made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; or

        (c)     Engaged in acts, practices, and a course of business that operated as a

fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases or

acquisitions of Conn's common stock and/or call options, or sales and writings of Conn's put

options during the Class Period.

87.     Plaintiffs and the Class have suffered damages in that, in reliance on the integrity

of the market, they paid artificially inflated prices for Conn's common stock and call options,

39

and received artificially deflated premiums for puts sold or written. Plaintiffs and the Class would not have purchased or acquired Conn's common stock and/or call options, or sold/wrote Conn's put options at the prices at which they transacted, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

88.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases or acquisitions of Conn's common stock and/or call options, or sales or writings of Conn's put options during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

89.     Plaintiffs repeat, incorporate, and reallege paragraphs 1 through 88 by reference.

90.     The Individual Defendants acted as controlling persons of Conn's within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Conn's, the Individual Defendants had the power and ability to control the actions of Conn's and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.     Awarding Plaintiffs and the members of the Class damages and interest;

C.     Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: May 5, 2014

Respectfully submitted,

By:  _s/Thomas R. Ajamie_
Thomas R. Ajamie
(Texas Bar No. 00952400)
**AJAMIE LLP**
Pennzoil Place - South Tower
711 Louisiana, Suite 2150
Houston, Texas  77002
Telephone: (713) 860-1600
Facsimile: (713) 860-1699
E-mail: tajamie@ajamie.com

*Liaison Counsel*

Joseph P. Guglielmo
Donald A. Broggi
**SCOTT+SCOTT LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, New York  10174
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com

Christopher J. Keller
Eric J. Belfi
Michael W. Stocker
**LABATON SUCHAROW LLP**
140 Broadway
New York, New York  10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
E-mail: ckeller@labaton.com
ebelfi@labaton.com
mstocker@labaton.com

*Counsel for the Laborers Pension Trust Fund –
Detroit and Vicinity, the Connecticut Carpenters
Benefit Funds, and St. Paul Teachers' Retirement
Fund Association*